# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **MICHAEL WEBSTER,** | ) |
| | ) |
| **Petitioner,** | ) |
| | )   **NO. 3:16-cv-1979** |
| **v.** | )   **CHIEF JUDGE CRENSHAW** |
| | ) |
| **SHAWN PHILLIPS, Warden** | ) |
| | ) |
| **Respondent.** | ) |

## MEMORANDUM OPINION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner Michael Webster is serving a term of 25 years' imprisonment imposed by the Davidson County Criminal Court on November 4, 2010, after a jury convicted him of second-degree murder. (Doc. No. 13-1 at Page ID# 68.) Respondent has filed an answer to the petition (Doc. No. 14) that the petition is without merit.

The matter is ripe for review and the court has jurisdiction. 28 U.S.C. § 2241(d). Respondent does not dispute that the petitioner's federal habeas petition is timely. (Doc. No. 14 at Page ID# 1007.) Respondent states that the federal habeas petition at issue here appears to be Petitioner's first application for federal habeas relief. (Id.)

Because a federal court must presume the correctness of a state court's factual findings unless the petitioner rebuts this presumption with 'clear and convincing evidence," 28 U.S.C. § 2254(e)(1), and because the issues presented can be resolved with reference to the state-court record, the court finds that an evidentiary hearing is not necessary. See Schriro v. Landrigan, 550 U.S. 464, 474 (2007) (holding that if the record refutes a petitioner's factual allegations or otherwise precludes habeas relief, the district court is not required to hold an evidentiary hearing (citing Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998))). For the reasons below, the

Court finds that Petitioner is not entitled to relief. Accordingly, the petition will be denied and this matter dismissed.

## I.     PROCEDURAL BACKGROUND

The state prosecution arose from the shooting death of Nickalus "Sleepy" Jones. In November, 2009, Petitioner was indicted by the Davidson County grand jury and charged with one count of first-degree murder. (Doc. No. 13-1 at Page ID# 42-44.) Petitioner was tried before a jury beginning September 13, 2010 and concluding on September 15, 2010. (Doc. Nos. 13-2-13-4.) At the conclusion of the trial, the jury found Petitioner guilty of the lesser-included offense of second-degree murder. (Doc. No. 13-4 at Page ID# 537.) Following a sentencing hearing conducted on October 28, 2010 and November 18, 2010, Petitioner was found to be a range-one offender and was sentenced to a term of 25 years' imprisonment. (Doc. Nos. 13-6-13-7.)

Petitioner appealed his judgment of conviction to the Tennessee Court of Criminal Appeals ("TCCA"), which rejected all appellate arguments, and affirmed Petitioner's conviction and sentence in an unpublished opinion issued on December 5, 2012. (Doc. No. 13-13; see also State v. Michael Webster, No. M2011-00521-CCA-R3-CD; 2012 WL 6032507, at *1 (Tenn. Crim. App. Jan. 18, 2013) [Webster I].) Petitioner filed an application for permission to appeal to the Tennessee Supreme Court, which was denied on April 9, 2013. (Doc. Nos. 13-14, 13-15.) [1]

On August 9, 2013, Petitioner filed a petition for post-conviction relief in the Davidson County Criminal Court. (Doc. No. 13-16 at Page ID## 820-25.) On October 3, 2013, counsel

---

[1] In Tennessee, review by the state Supreme Court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" Adams v. Holland, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

was appointed to assist the petitioner.  (Id. at Page ID# 830.)  Counsel amended the petition for post-conviction relief twice.  (Id. at Page ID## 833-40, 841-49.)  The matter was heard in the trial court on May 1, 2014, and on September 30, 2014, the court issued an order denying relief. (Doc. Nos. 13-17 at Page ID## 144-148; 13-16 at Page ID## 853-63.)

Petitioner appealed to the TCCA, which denied relief on December 22, 2015.  (Doc. No. 13-21; see also Michael Webster v. State, No. M2014-02019-CCA-R3-PC, 2015 WL 9412755, at *1 (Tenn. Crim. App. Dec. 22, 2015) [Webster II].)  Petitioner filed an application for permission to the appeal to the Tennessee Supreme Court, which was denied on June 23, 2016. (Doc. No. 13-22-13-23.)

## II.   STATEMENT OF FACTS

The TCCA summarized the facts presented at trial as follows:

> On July 30, 2009, officers were called multiple times to a Nashville subsidized housing development at University Court.  The call in question was a shooting.  When they arrived, officers discovered the victim, Nickalus "Sleepy" Jones, lying on the ground near a Jeep Cherokee. Paramedics were called, but the victim died as a result of the gunshot wound.  Officers arrested Appellant on August 2, 2009, and they recovered a weapon and ammunition at the home where Appellant was found.

> At trial, multiple witnesses testified that they saw the altercation between Appellant and the victim.  The testimony was that Appellant and the victim encountered each other near unit 145A.  Appellant asked the victim where his gun was.  The victim replied that he did not have a gun and lifted up his shirt to prove it.  Witnesses testified that they did not see a gun when the victim lifted up his shirt.  The victim begged for his life and told Appellant that he had children.  According to witnesses, Appellant shot the victim as the victim was facing him, and when the victim ran away, Appellant chased him and continued to shoot at him.

> Officers searched the area near the victim's body.  They found a spent bullet in the nearby Jeep Cherokee.  They did not find any shell casings or a weapon near the location of the victim's body or on the victim's person. The medical examiner, John Davis, performed an autopsy on the victim's body.  He testified that the cause of death was the gunshot wound.  He

recovered a bullet from the victim's body. Agent Alex Broadhag with the Tennessee Bureau of Investigation ("TBI") ran a ballistics test on the gun found during Appellant's arrest. Agent Broadhag testified that he was "certain" that the bullet that caused the victim's death which was recovered during the autopsy was fired from the gun found during Appellant's arrest.

Appellant testified on his own behalf at trial. He admitted that he was involved in a verbal altercation with the victim. However, he disagreed with the other witnesses' version of events. He stated that when the victim lifted up his shirt, the victim had a gun. Therefore, he presented a defense of self-defense.

At the conclusion of the trial, the jury found Appellant guilty of the lesser included offense of second degree murder. The trial court sentenced Appellant as a Range I, standard offender to twenty-five years of incarceration with a 100% release eligibility.

Webster I, 2012 WL 6032507, at *1–2.

The TCCA summarized the evidence presented at the post-conviction evidentiary

hearing, in pertinent part, as follows:

[T]he Petitioner testified that trial counsel failed to interview witnesses. The Petitioner testified that he provided trial counsel with the names of two witnesses, "Fun Fun" and "Kiki," but, "to [his] knowledge[,] she never went and checked or asked [any] questions." He only knew these witnesses by their "street names," but he said that he provided trial counsel with addresses where they could be located. The Petitioner testified that he knew that trial counsel did not attempt to find the witnesses "[because] if [counsel] would have went [sic] to the address[,][she] would have found them." He agreed that trial counsel told him that she was unable to locate the witnesses, but he was skeptical that she had actually made an effort to find them.

Contrary to his earlier testimony, on cross-examination the Petitioner admitted that he did know about his preliminary hearing prior to the hearing date because someone at the jail told him about it. However, he claimed that he did not meet trial counsel at all until after the hearing and that she waived his appearance without his permission. According to the Petitioner, he was imprisoned for a full month after the preliminary hearing before trial counsel met with him for the first time. The Petitioner testified that trial counsel did not tell him that identity might be an issue in the case or explain that she did not want to risk his being identified by witnesses at the preliminary hearing.

4

The Petitioner testified that trial counsel provided him with a copy of discovery sometime in November 2009. He and trial counsel "somewhat" discussed the discovery materials, and they also talked about several of the witnesses. The Petitioner estimated that he and trial counsel discussed the facts of his case two to three times for fifteen to twenty minutes each time. He and trial counsel also discussed the content of his statement to police wherein the Petitioner claimed that he was "defending himself" when he shot the victim. The Petitioner disagreed that saying he was "defending himself" was the same as saying that he acted in "self-defense." He opined that voluntary manslaughter would have been a better defense strategy because he and the victim "had a heated discussion before anything ever occurred," and, therefore, he was "in a state of passion" when he shot the victim.

Trial counsel testified that she spoke with the Petitioner prior to his preliminary hearing and that they discussed waiving his appearance, although she did not receive a written waiver from him. According to trial counsel, she met with the Petitioner in jail several times before the preliminary hearing, including on the morning of the preliminary hearing.

Trial counsel stated that, in the approximately one-year period between the "bind over" and trial, she met with the Petitioner over thirty times. During these meetings, trial counsel and the Petitioner discussed the discovery materials and trial strategy. Trial counsel testified that she received input from the Petitioner regarding trial strategy and that, because of his statement to police in which he claimed to be defending himself, the defense was going to be a claim of self-defense. Trial counsel did not remember the Petitioner's telling her that he wanted to pursue a voluntary manslaughter defense.

Trial counsel spoke with witnesses to the shooting about the altercation that had occurred between the Petitioner and the victim prior to the shooting and about an apparent fight between the two that occurred earlier in the day. The altercation appeared to have been verbal, and there was no evidence that any kind of physical fight occurred. Trial counsel said that she spoke with all the witnesses that she was able to find. She testified that, although no weapon was found on the victim, she decided to pursue a claim of self-defense because the Petitioner insisted that he saw the victim with a gun. Pictures of the victim showed that he had a large, silver belt buckle on at the time, allowing for the inference that the Petitioner might have mistaken it for a gun.

Trial counsel recalled the Petitioner's telling her about Fun Fun and Kiki, but she denied that she had an address for either witness. She further stated

that, although other witnesses apparently knew who they were, she never learned their real names. Trial counsel did receive information that they lived in the 12th Avenue North area, and she sent an investigator to the neighborhood to look for them, but to no avail. Additionally, trial counsel testified that she personally looked for these two witnesses in the University Court area on several occasions but was ultimately unsuccessful. She testified that she pursued all leads on witnesses provided by the Petitioner.

Trial counsel remembered that after voir dire, one of the jurors sent an e-mail to the jury coordinator stating that he had a conflict and was not comfortable serving on the jury. The e-mail from the excused juror was admitted as an exhibit at the post-conviction hearing. In the letter, the juror expressed his surprise at being picked for the jury panel because, during voir dire, he disclosed his close ties to the community where the shooting occurred. The juror stated that he did not feel comfortable serving on the jury and that he was concerned he may know some of the witnesses in the case. The juror was removed from the jury panel, and trial counsel stated that she did not voir dire him before he was released. Trial counsel agreed that she did not move for a mistrial based on the possibility that the excused juror had influenced other members of the jury panel.

Trial counsel agreed that she did not raise any objections during cross-examination of the Petitioner and explained that was because she believed that the Petitioner "was doing a very good job on direct and during cross-examination." Trial counsel was asked why she did not object to the following question from the prosecutor: "[C]an you approximate for us how many days did you work in the week before the murder?" Specifically, she was asked why she did not object to the prosecutor's use of the word "murder." Trial counsel said that "it wouldn't have occurred to [her]" to object to that question.

On cross-examination, trial counsel testified that she met with the Petitioner at least twice prior to the preliminary hearing and explained that she advised the Petitioner against appearing at his preliminary hearing because she thought identity might be an issue at trial, and she did not want witnesses to positively identify him at the hearing. She claimed that, at the time of hearing, she was not aware that the Petitioner had given a statement to the police wherein he admitted to shooting the victim. According to trial counsel, the Petitioner did not object to waiving his appearance at the preliminary hearing.

Trial counsel testified that she met with the Petitioner multiple times after receiving discovery. She estimated that she met with him thirty-plus times in jail, in addition to when she saw him on court dates. At these meetings, trial counsel discussed the discovery materials with the Petitioner, including

recorded witness statements. According to trial counsel, she and the Petitioner discussed proceeding on a self-defense claim. Trial counsel agreed that proving self-defense would have been difficult because witness statements indicated that the victim was unarmed and unaggressive. However, trial counsel planned to rely on the fact that the victim was wearing a belt buckle to support a theory that the Petitioner thought he saw a gun when the victim lifted his shirt.

Trial counsel testified that the Petitioner never told her that he did not want to claim self-defense and never told her that he would rather proceed with a voluntary manslaughter defense. Trial counsel's decision to utilize a self-defense claim was based on the fact that the Petitioner had told police he was defending himself. She agreed that, generally, they pursued an "anything but first degree murder defense." Thus, in her closing statement, she actually did ask the jury to convict him of the lesser included offense of voluntary manslaughter if they decided that he had not acted in self-defense.

With respect to the dismissed juror, trial counsel recalled that, on the night of the first day of trial, one of the jurors wrote an email indicating that he was too conflicted to serve as a juror. Trial counsel could not remember whether the juror came to court on the second day of trial. To the best of trial counsel's recollection, the juror was dismissed prior to opening statements. She surmised that, because of the timing of the dismissal, the juror would have had very little opportunity to speak with other jurors about the case, and there was no evidence that he had tainted the jury. The parties agreed that he would be designated as one of the alternate jurors so that the case could proceed without interruption.

On September 20, 2014, the post-conviction court filed a detailed order denying the petition for post-conviction relief. With respect to the waiver of the Petitioner's appearance at the preliminary hearing, the court accredited trial counsel's testimony that the appearance was waived for tactical reasons. The court also concluded that the Petitioner's waiver of his right to appear was knowing and voluntary. Further, the court noted that the Petitioner had "in no way suggested how his absence from the preliminary hearing prejudiced him. . . ."

Next, the post-conviction court addressed the Petitioner's claim that trial counsel failed to adequately communicate with him. The court noted that, assuming the Petitioner's testimony was true regarding the number of times he met with trial counsel, the total number of meetings would add up to approximately fourteen. The trial court determined that if trial counsel's testimony was accredited, the total number of meetings would be at least thirty-three. The court concluded that, based on either account, the number of meetings "appear[ed] to be reasonable." With respect to the substance of

these meetings and the Petitioner's claims that there was no meaningful discussion regarding discovery or trial strategy, the court again accredited trial counsel's testimony that she discussed the case extensively with the Petitioner. In making this determination, the court noted that the Petitioner had actually testified that he and trial counsel went over the facts of his case several times and that he was provided with discovery early in the progression of his case.

The post-conviction court also concluded that trial counsel's reliance on a theory of self-defense was reasonable given the Petitioner's own statement to police that he was defending himself. There was a "history of animosity" between the Petitioner and the victim, which supported claims of both self-defense and voluntary manslaughter; however, the court found that it was reasonable to mainly focus on self-defense. The post-conviction court also found that the Petitioner failed to establish prejudice with respect to his claims that trial counsel did not adequately communicate with him or pursue a reasonable trial strategy.

The court found that trial counsel was persistent in her pursuit of potential witnesses, although she was ultimately unable to locate Fun Fun and Kiki, whom the Petitioner had specifically asked her to find. The court pointed out that the Petitioner had failed to produce any of the witnesses at issue at the post-conviction hearing, resulting in a failure to prove prejudice. Likewise, the court discredited the Petitioner's claims that trial counsel should have objected to the prosecutor's questions on cross-examination. The court found that "the objections would not have been sustained or were of minor significance."

Finally, the post-conviction court rejected the Petitioner's contention that trial counsel was ineffective for failing to move for a mistrial based on juror misconduct. The court found that the juror was actually voir dired by the trial court before he was dismissed, and the juror assured the trial court that "he did not share with any of the other jurors anything about his purported bias and the inability to serve as a juror on the trial." Therefore, there was no reason for trial counsel to request a mistrial, and the Petitioner was not prejudiced by her failure to do so.

Webster II, 2015 WL 9412755, at *1–5.

## III.   ISSUES PRESENTED FOR REVIEW

In his *pro se* petition, Petitioner claims that his counsel was ineffective for:

1.  Failing to Inform Petitioner of his Right to be Present at the Preliminary Hearing

2. Failing to Meet with Petitioner to Discuss the Case

3. Failing to Request a Mistrial after a Juror was Excused

4. Failing to Meaningfully Investigate and Interview Witnesses

5. Failing to Consult with Petitioner to Develop a Trial Strategy

6. Failing to Object During Petitioner's Cross-examination

(ECF No. 1.)

## IV. <u>STANDARD OF REVIEW</u>

This matter is governed by the provisions of the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"). <u>See</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 792 (2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." <u>Bell v. Cone</u>, 543 U.S. 447, 455 (2005) (citations omitted); <u>see</u> <u>Hardy v. Cross</u>, 565 U.S. 65, 66 (2011); <u>Felkner v. Jackson</u>, 562 U.S. 594, 597 (2011). "AEDPA requires heightened respect for state court factual and legal determinations." <u>Lundgren v. Mitchell</u>, 440 F.3d 754, 762 (6th Cir. 2006). "State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence." <u>Davis v. Ayala</u>, 135 S. Ct. 2187, 2199-2200 (2015) (citations and internal quotations omitted).

If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); <u>see</u> <u>Premo v. Moore</u>, 562 U.S. 115, 121 (2011); <u>Waddington v. Sarausad</u>, 555 U.S. 179, 190 (2009). AEDPA prevents federal habeas "retrials" and "ensure[s] that state-court convictions are given effect to the extent possible under law." <u>Bell</u>, 535 U.S. at 693 (2002). It prohibits "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." <u>Parker v. Matthews</u>, 567 U.S. 37, 38 (2012).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000); <u>Bailey v. Mitchell</u>, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, this court may not rely on the decisions of lower federal courts. <u>Lopez v. Smith</u>, 135 S. Ct.1, 4 (2014); <u>Harris v. Stovall</u>, 212 F.3d 940, 943-44 (6th Cir. 2000). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. <u>Greene v. Fisher</u>, 565 U.S. 34, 39 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Tennessee state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. <u>Miller v. Stovall</u>, 742 F.3d 642, 644-45 (6th Cir. 2014) (citing <i>Greene</i>, 565 U.S. at 38).

The AEDPA standard is difficult to meet "because it was meant to be." <u>Harrington v. Richter</u>, 562 U.S. 86, 102 (2011); <u>see</u> <u>Burt v. Titlow</u>, 134 S. Ct. 10, 16 (2013); <u>Metrish v. Lancaster</u>, 569 U.S. 351, 357-58 (2013); <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011). Indeed. "habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." <u>Harrington</u>, 562 U.S. at 102-03 (citation and internal quotation omitted); <u>see</u> <u>Woods v. Donald</u>, 135 S. Ct. 1372, 1376 (2015).

Under AEDPA, 28 U.S.C. § 2254(d):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

      (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

      (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Ayala, 135 S. Ct. at 2198; see also White v. Wheeler, 136 S. Ct. 456, 460 (2015) (explaining that the Supreme Court, "time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.') (internal citation omitted).

      A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in United States Supreme Court cases, or if it decides a case differently than the United States Supreme Court has done on a set of materially indistinguishable facts. Bell, 535 U.S. at 694 (citing Williams, 529 U.S. at 405-06). The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from United States Supreme Court decisions but unreasonably applies it to the facts of the particular case. Id. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Williams, 529 U.S. at 411; accord Bell, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." Williams, 529 U.S. at 409. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement'

on the question." White v. Woodall, 134 S. Ct. 1697, 1706-07 (2014) (quoting Harrington, 562 U.S. at 103).

## V.  DISCUSSION

### A.  Ineffective Assistance of Counsel:  Legal Standard

Petitioner argues that his trial counsel was ineffective for a number of reasons.  In Strickland v. Washington, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-part test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  Id. (citing Michel v. Louisiana, 350 U.S. 91, 101 (1955)); see also Nagi v. United States, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  Id. at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of Strickland under § 2254(d), the deferential standard of Strickland is "doubly" deferential.  Harrington, 562 U.S. at 105 (citing Mirzayance, 556 U.S. at 123); see also

Titlow, 134 S. Ct. at 13; Cullen, 563 U.S. at 189; Moore, 562 U.S. at 122. In those

circumstances, the question before the habeas court is "whether there is any reasonable argument

that counsel satisfied Strickland's deferential standard." Id.; Jackson v. Houk, 687 F.3d 723,

740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the

difficulty of prevailing on a Strickland claim in the context of habeas and AEDPA . . . .") (citing

Richter, 562 U.S. at 101-02).

With these legal principles in mind, the Court considers each of the Petitioner's

claims.

## B. Ineffective Assistance of Counsel: Analysis

### 1. Failure to Inform Petitioner of his Right to be Present at the Preliminary Hearing

Petitioner contends that his trial counsel was ineffective because she failed to meet with

him prior to his preliminary hearing and waived his appearance at that hearing without his

permission. The TCCA considered this claim as follows:

> [T]rial counsel testified that she met with [Petitioner] at least twice before the
> [preliminary] hearing and that she discussed waiving his appearance based on her
> belief that identity might be an issue in the case. Trial counsel explained that, at
> the time of the preliminary hearing, she was not yet aware of a statement the
> Petitioner gave to police wherein he admitted to shooting the victim, albeit in self-
> defense. The post-conviction court accredited trial counsel's testimony in this
> respect and found that the waiver of appearance was a reasonable strategic
> decision. It is well-established that, in post-conviction proceedings, "we should
> defer to trial strategy or tactical choices if they are informed ones based upon
> adequate preparation." Hellard v. State, 629 S.W.2d 4, 9 (Tenn.1982). The
> evidence reflects that trial counsel made a reasonable strategic decision based on
> the information she had at the time of the preliminary hearing, and the Petitioner
> is not entitled to relief on this issue.

Webster II, 2015 WL 9412755, at *6.

As noted above, this Court must presume the correctness of a state court's factual

findings unless Petitioner rebuts this presumption with "clear and convincing evidence." 28

U.S.C. § 2254(e)(1). Petitioner has not put forward any evidence, let alone clear and convincing evidence, to contradict the trial court's factual findings accrediting trial counsel's testimony. Thus, the trial court's factual findings guide the Court's analysis.

Judicial scrutiny of performance is highly deferential, and "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Therefore, this court should judge whether, in light of all the circumstances viewed at the time of counsel's conduct, counsel's "acts or omissions were outside the wide range of professionally competent assistance." Id. at 690. Given that counsel was unaware that Petitioner had already told the police that he shot the victim, a fact that Petitioner does not dispute, it was a reasonable strategic decision for counsel to advise Petitioner to waive his appearance at the preliminary hearing so that the State's witnesses would not have a chance to identify him before trial.

Even if the Court accredited Petitioner's testimony, and not trial counsel's testimony, and even if the Court found that trial counsel was deficient for not informing Petitioner about the preliminary hearing,[2] Petitioner would still not be able to establish that trial counsel was ineffective because he cannot establish prejudice. Petitioner does not contend, and certainly has not demonstrated, that his absence from the preliminary hearing had any effect on the outcome of his trial. Further, any prejudice that potentially arose from counsel's waiving Petitioner's appearance at the preliminary hearing was mooted by Petitioner's eventual conviction at trial, which is the reason for his custody. See Gerstein v. Pugh, 420 U.S. 103, 119 (1975). Because

---

[2] As there is no constitutional right to a preliminary hearing, see Gerstein v. Pugh, 420 U.S. 103, 119 (1975), it is questionable whether Petitioner can assert an ineffective assistance claim based on his trial counsel's behavior in connection with the preliminary hearing.

Petitioner is now incarcerated pursuant to a valid conviction, he cannot challenge the preliminary procedures employed prior to his trial. Accordingly, Petitioner has failed to establish that the state court's rejection of this claim constituted an objectively unreasonable application of Strickland.

        2.   Failure to Meet with Petitioner to Discuss the Case

Petitioner contends that his trial counsel was ineffective because she failed to adequately communicate with him about his case. The TCCA considered this claim as follows:

> In the Petitioner's estimation, trial counsel met with him once every other month in the year leading up to his trial. According to trial counsel, she met with the Petitioner over thirty times during that same period. The post-conviction court concluded that, even taking the Petitioner's estimate of meetings as true, the number of meetings was appropriate. Indeed, regardless of the number of actual meetings, the Petitioner admitted that trial counsel discussed the facts of his case with him two to three times and that she provided him with all of the discovery materials. Also, she talked with the Petitioner about his statement to police and witness statements. We agree that, irrespective of the specific number of meetings between trial counsel and the Petitioner, the substance of the meetings included a thorough discussion of the Petitioner's case. Therefore, the Petitioner has not proven that trial counsel was ineffective in this respect.

Webster II, 2015 WL 9412755, at *6.

The state court found that whether relying on Petitioner's or trial counsel's testimony about the number of times trial counsel visited Petitioner, trial counsel adequately communicated with Petitioner regarding his case. Petitioner has not offered any evidence to suggest that this finding should be disturbed. However, even if the Court were to conclude that trial counsel did not meet with Petitioner as frequently as she should have, Petitioner still could not establish that counsel was ineffective because "the mere fact that counsel spent little time with [a defendant] is not enough under Strickland, without evidence of prejudice or other defects." Bowling v. Parker, 344 F.3d 487, 506 (6th Cir. 2003). In this case, Petitioner has not established that counsel's

consultation with him was insufficient, or that the number of meetings he had with counsel were inadequate to allow him to understand and participate in his defense. Nor has he established how additional meetings might have altered the outcome of the trial. See Hill v Mitchell, 400 F.3d 308, 324-25 (6th Cir. 2005) (finding that petitioner failed to establish prejudice where he failed to demonstrate how trial counsel's infrequent pretrial visits and failure to establish a more amenable attorney-client relationship impacted counsel's advocacy); Lenz v. Washington, 444 F.3d 295, 303 (4th Cir. 2006) (finding that petitioner could not prevail on his claim that attorneys were ineffective due to infrequent pre-trial visits where he failed to show resulting prejudice). Therefore, the state court's decision rejecting this claim was not contrary to or an unreasonable application of Strickland.

### 3. Failure to Request a Mistrial after a Juror was Excused

Petitioner contends that his trial counsel was ineffective because she failed to seek a mistrial based on possible jury contamination after an empaneled juror was excused based on a conflict. The TCCA considered this claim as follows:

> Determining whether to request a mistrial is a strategic decision and considerable deference is given to trial counsel when analyzing the effectiveness of counsel's assistance regarding trial strategies. See Wiley v. State, 183 S.W.3d 317, 33132 (Tenn.2006); see also Wiggins v. Smith, 539 U.S. 510, 521–22 (2003). The post-conviction court reviewed the trial record and found that the juror was voir dired prior to being dismissed and that the trial court believed that the juror had not discussed the case or his conflict with the rest of the jury panel. Further, he was immediately released from jury service. Trial counsel testified that she did not request a mistrial because the juror was excused before the presentation of any proof and because there was no reason to believe that the dismissed juror influenced other members of the jury. Under these circumstances, trial counsel was not ineffective for failing to request a mistrial. The Petitioner is not entitled to relief on this issue.

Webster II, 2015 WL 9412755, at *7.

After the jury was impaneled, the state called its first witness, Deborah Thomas. Ms. Thomas testified as a witness to the events that resulted in the victim's death. (Doc. No. 13-2 at Page ID## 90-159.) At the conclusion of her testimony, the trial was recessed for the evening, and the trial court gave the following admonition:

> Please keep in mind that you cannot discuss anything about the case with anyone else, either between yourselves, family, friends, neighbors or anyone else. Avoid any TV coverage or other news media coverage that may occur, if any. Do not do any independent investigation. And if someone should approach you for any reason when you're coming into or exiting the courthouse to talk about this case, please notify my staff so we can address that issue.

(Id. at Page ID# 159.) Later that evening, one of the empaneled jurors, Earl Jordan, emailed the jury coordinator, expressing his surprise that he was selected as a juror given that he "explained to both the State and Defense of my conflict of interest with this murder trial" and requesting that he be relieved of his duty to hear this case. (Doc. No. 13-18 at Page ID## 946-47.) Specifically, Mr. Jordan explained that he was born and raised in the area where the victim was murdered and was "familiar" with many of the residents that live in that area, that he runs an organization that supports the families of murder victims and that his organization frequently conducts "events and outreach programs for the residents" of the JC Napier and Tony Sudekum homes, including "candlelight prayer vigils for murdered loved ones, [and] speaking out against senseless murder and gun violence in the neighborhood." (Id.) Mr. Jordan also explained that before the first witness was called, the state mentioned the name of Dorothy Stephenson, who would be testifying in the case. (Id.) Ms. Stephenson was a former student at the school where Mr. Jordan works. (Id.) Mr. Jordan explained that he told "the assistant who navigated us from the courtroom" of his concerns about sitting on the jury and that he knew Ms. Stephenson. (Id.) He was told to return to court the next day and the assistant would speak to the judge. (Id.) The

next day, September 14, 2010, prior to the jury taking the jury box, the trial court gave the prosecutor and defense counsel a copy of Mr. Jordan's email and together they discussed what to do about Mr. Jordan. (Doc. No. 13-3 at Page ID## 165-66.) The trial court expressed its fear that Mr. Jordan might negatively influence the other jurors if he were allowed to remain on the jury, and it was agreed by the trial court, the prosecutor and defense counsel that Mr. Jordan would be released from service. (Id. at Page ID# 166.) Defense counsel asked the trial court if "we could just inquire of him . . . if he's said anything else to the jurors, I'm sure he hasn't, but still, just to be sure." (Id.)[3] The judge had Mr. Jordan brought into court, and the following colloquy ensued:

> THE COURT: Mr. Jordan, we are in receipt of the e-mail that you sent, have you had any communication with any of the other jurors about your being disgruntled about having been selected as a juror on the trial of this case?
>
> MR. JORDAN: No .
>
> THE COURT: You have made no reference to any of the other jurors about your knowledge of this witness or anything other than what you told everybody in open court yesterday?
>
> MR . JORDAN: No, only person that I told was the court officer, and I referred that to him yesterday after we left.
>
> THE COURT: And did you do that with him outside the presence of the other jurors?
>
> MR. JORDAN: Yes, sir, yes, sir.
>
> THE COURT: All right, Mr. Jordan, you're discharged from further service on this jury.
>
> MR . JORDAN: Thank you.

---

[3] At trial, Petitioner was represented by two attorneys—Kristin Neff, who was Petitioner's counsel from the preliminary hearing through trial, and Katie Weiss, who assisted Ms. Neff at the Petitioner's trial. Ms. Weiss requested that the trial court inquire as to whether Mr. Jordan had in any way tainted the jury. Ms. Neff was the attorney who testified at the post-conviction hearing.

(Id. at Page ID# 167.)  Thereafter, the trial continued without Mr. Jordan serving on the jury.

Courts have recognized that the decision not to seek a mistrial may be a strategic one. See, e.g., United States v. Hemphill, 76 F. App'x. 6, 16, (6th Cir. 2003) (finding absence of plain error based on failure to move for mistrial  . . . where "defendant's counsel may have decided to forego a motion for mistrial because, as a strategic decision, he preferred to test the government's case with the jury that was impaneled . . . ."); United States v. Washington, 198 F.3d 721, 723 (8th Cir. 1999) ( "ultimate decision on whether to request a mistrial . . . is a strategic decision for counsel").  Given the circumstances present here, it was reasonable for trial counsel not to seek a mistrial.  First, the jury had just been selected and only one witness had testified.  Second, before excusing the jury for the evening, the trial court admonished the jurors not to discuss the case with anyone, including each other.  Third, trial counsel had asked the court to question Mr. Jordan to determine whether he might have tainted the jury and, as requested, the court questioned Mr. Jordan.  Finally, having satisfied itself that Mr. Jordan had not tainted the jury, the court discharged Mr. Jordan and resumed the trial with the remaining jurors.  Petitioner does not offer an evidence to establish that trial counsel's decision not to seek a mistrial was unreasonable.

Moreover, the decision whether to grant a mistrial is left to the trial court's discretion. See e.g., State v. Robinson, 146 S.W.3d 469, 494 (Tenn.2004).  A trial court should declare a mistrial "only upon a showing of manifest necessity."  Id. (citing State v. Saylor, 117 S.W.3d 239, 250–51 (Tenn.2003)).  The party seeking a mistrial has "the burden of establishing the necessity of a mistrial."  State v. Reid, 164 S.W. 3d 286, 342.  Given that the trial court questioned Mr. Jordan who assured the trial court, more than once, that he had not discussed his

19

concerns about sitting as a juror in Petitioner's trial with any other juror on the panel, nor did he ever discuss his concerns in the presence of other jurors, it is unlikely, at best, that the trial court would have granted a motion for mistrial. Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. See Smith v. Bradshaw, 591 F.3d 517, 523 (6th Cir. 2010); O'Hara v. Brigano, 499 F.3d 492, 506 (6th Cir. 2007).

    4. <u>Failure to Meaningfully Investigate and Interview Witnesses</u>

Petitioner contends that his trial counsel was ineffective because she failed to locate and interview witnesses who Petitioner believes would have aided him in his defense. The TCCA considered this claim as follows:

> With respect to the Petitioner's claim that trial counsel was ineffective for failing to locate and interview witnesses, none of these potential witnesses testified at the evidentiary hearing. We have long held that when a petitioner claims that counsel was ineffective for failing to discover, interview or present witnesses, "these witnesses should be presented by the Petitioner at the evidentiary hearing." <u>Black v. State</u>, 794 S.W2d 752, 757 (Tenn.Crim.App.1990). This is the only way that the Petitioner can establish that failure "to call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the Petitioner." <u>Id.</u> Because the Petitioner failed to adhere to this imperative, he has failed to establish that he was prejudiced.

<u>Webster II</u>, 2015 WL 9412755, at *7.

At the post-conviction hearing, trial counsel testified that Petitioner gave her the names of four witnesses, Rudolph Johnson, Kiki, Fun Fun, and Arevius Turner.[4] (Id. at Page ID# 915.) Counsel spoke with Mr. Johnson and Mr. Turner, but concluded that neither would be able to assist in Petitioner's defense. (Id. at Page ID# 916.) Despite seeking information from witnesses they questioned at the scene about where KiKi and Fun Fun could be found, and despite

---

[4] KiKi and Fun Fun were the "street names" of two people. (Doc. No. 13-17 at Page ID# 889.) It is undisputed that Petitioner did not know their legal names. (Id. at Page ID# 889-90, 916-17.) Petitioner testified at the post-conviction hearing that he gave his counsel their addresses. (Id. at Page ID# 917.) Counsel testified that she did everything she could to find them, but was never able to do so. (See Doc. 13-17 at Page ID## 916-17, 927-28.)

following all the leads they were given as to where KiKi and Fun Fun might be, counsel testified that KiKi and Fun Fun could not be found. (Id. at Page ID## 901-02.) Petitioner, who was represented by counsel, did not call KiKi or Fun Fun to appear at the post-conviction hearing. Thus, KiKi and Fun Fun never testified and Petitioner has failed to offer any evidence suggesting what their testimony might have been.

The Sixth Circuit has long held that a petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material. See Hutchison v. Bell, 303 F.3d 720, 748 (6th Cir. 2002) (citing Austin v. Bell, 126 F.3d 843, 848 (6th Cir. 1997). Given the absence of any proof at Petitioner's post-conviction evidentiary hearing about what KiKi and Fun Fun would have testified to, the state court's conclusion that counsel was not ineffective was not objectively unreasonable. Petitioner is not entitled to relief on this claim.

### 5. Failure to Consult with Petitioner to Develop a Trial Strategy

Petitioner contends that his trial counsel was ineffective because she failed to consult with him to develop a trial strategy that reflected the evidence. The TCCA considered this claim as follows:

> [T]rial counsel . . . testified that she discussed proceeding on a claim of self-defense with the Petitioner, and he never indicated that he would have preferred a different defense. Trial counsel admitted that prevailing on a theory of self-defense would be difficult, but she chose to proceed with that defense based on the Petitioner's statement to police. . . . Trial counsel's testimony reflects that she made a reasonable strategic decision regarding which defense to pursue based on the evidence as a whole. Accordingly, the Petitioner has not proven that he was prejudiced by trial counsel's decision to pursue a self-defense claim.

Webster II, 2015 WL 9412755, at *6.

Petitioner testified that his trial counsel never discussed defense strategy with him, although he conceded that before trial his counsel talked with him about the fact that he made a statement to the police in which he admitted to killing the victim, maintaining that he did so in self-defense.  (Doc. No. 13-17 at Page ID## 884-85.)  Nevertheless, Petitioner testified that he believed trial counsel should have presented the defense of voluntary manslaughter because he and the victim "had a heated discussion prior to me shooting him."  (Id. at Page ID# 886.)

By contrast, trial counsel testified that she obtained Petitioner's input regarding defense strategy, that given Petitioner's statements to police self-defense was the defense strategy and that, although no witnesses testified that the victim had a gun, photographs of the victim showed that he had a large silver belt buckle which, trial counsel believed, might convince the jury that Petitioner "legitimately thought he had a gun."  (Id. at Page ID## 900, 914.)  Additionally, counsel testified that the witnesses she interviewed suggested that there was a "brief interaction right before the shooting," but none said there was a fight, only a verbal altercation, (Id. at Page ID# 900), and multiple witnesses testified that "the victim was begging for his life."  (Id. at Page ID# 915.)

It is a "longstanding and sound principle that matters of trial strategy are left to counsel's discretion."  Dixon v. Houk, 737 F.3d 1003, 1012 (6th Cir. 2013).  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  Strickland, 466 U.S. at 690-91.

Counsel's trial strategy was patently reasonable. Petitioner told the police he killed the victim while defending himself, therefore, counsel reasonably believed that the best strategy was

to present a defense that was consistent with Petitioner's statements. Counsel also reasonably believed that the jury might be persuaded to find self-defense where photographs of the victim showed a large silver belt buckle that could be mistaken for a gun. Moreover, even if counsel's trial strategy was deficient, Petitioner has not established how he was prejudiced. Significantly, the state court found that there was evidence at trial regarding an on-going dispute between Petitioner and the victim and that trial counsel argued to the jury that should it reject the self-defense claim, it should consider the lesser included charge of voluntary manslaughter. Webster II, 2015 WL 9412755, at * 6. Thus, voluntary manslaughter was presented to the jury as an alternative to self-defense. Petitioner has failed to offer any evidence to suggest that there is a reasonable probability that had counsel employed a different defense startegy, he would have obtained a better result. Strickland, 466 U.S. at 694-95.

6. Failure to Object During Petitioner's Cross-examination

Petitioner contends that his trial counsel was ineffective because she failed to object during Petitioner's cross-examination. Specifically, Petitioner argue that during his cross-examination, "the prosecution continuously badgered the Petitioner, asked questions that had been asked and answered and mischaracterize[d] and misstated Petitioner's previous answers and Petitioner's previous testimony all without objection from [trial counsel]. (Doc. No. 1 at Page ID# 5.) The TCCA considered this claim as follows:

> Petitioner alleges that trial counsel was ineffective for failing to make any objections during cross-examination of the Petitioner. At the evidentiary hearing, the Petitioner questioned trial counsel about why she did not object to the prosecutor's use of the word "murder" in a question posed to the Petitioner. Trial counsel replied that it did not occur to her to object. She further explained that, generally, she did not make objections during the Petitioner's cross-examination because she believed that he was doing a good job. Although we agree that utilizing the word "murder" could undermine a claim of self-defense, we fail to see how this fleeting reference, and counsel's failure to object to it, prejudiced the

outcome of trial.  The Petitioner admitted to shooting the victim, and his claim that he was defending himself had already been greatly undermined by eyewitness accounts and evidence that the victim was unarmed.  The Petitioner has pointed to no other specific question that he believes trial counsel should have objected to.  This issue is without merit.

Webster II, 2015 WL 9412755, at *7.

"Because the decision to object in a particular instance is made in the strategic context of an entire trial, any single failure to object does not constitute error unless the information introduced is so prejudicial to a client that failure to object essentially defaults the case to the state." Hodge v. Haeberlin, 579 F.3d 627 (6th Cir. 2009); accord Hutton v. Mitchell, 839 F.3d 486, 505 (6th Cir. 2016).  Post-conviction counsel did not ask trial counsel any other specific questions about her failure to object during Petitioner's cross-examination, or any other part of the trial.  Thus, it would strain credulity to suggest that counsel's failure to object to the use of the word "murder" in this single question "essentially default[ed] the case to the state."  Id.

Petitioner was charged with first-degree murder and the evidence against him was quite strong, as multiple witnesses testified that they saw Petitioner shoot the victim, who was begging for his life, and that when the victim began to run away, Petitioner chased him and continued shooting.  (See e.g. Doc. No. 13-2 at Page ID# 96-108 (Deborah Thomas' testimony that she saw Petitioner shoot the victim, who was pleading for his life with his hands up, and saw Petitioner run after, and continue shooting the victim as the victim ran away); Doc. No. 13-3 at Page ID## 142-50 (Dorothy Stephenson's testimony that she saw Petitioner shoot the victim and saw Petitioner run after, and continue shooting the victim as the victim ran away, and that she heard the victim pleading for Petitioner not to shoot); Page ID## 294-301 (Janice Pearson's testimony that she heard somebody "hollering 'Man don't shoot me, why, why?'" and that she heard 3 shots fired); Page ID## 309-310 (Adrian Pearson's testimony that he saw Petitioner shoot the

victim, who was pleading with the Petitioner not to shoot him, and saw Petitioner run after and continue shooting as the victim ran away). Thus, even if trial counsel's failure to object during Petitioner's cross-examination was deficient, Petitioner cannot show that there is a reasonable probability that if counsel had objected during cross-examination Petitioner would have achieved a different result. <u>Strickland</u>, 46 U.S. at 694 (holding that to establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.")

## VI    CONCLUSION

For the foregoing reasons, the habeas corpus petition will be denied and this matter dismissed with prejudice.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. The petitioner may not take an appeal unless a district court judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when the petitioner demonstrates that "'reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different matter or that the issues presented were "adequate to deserve encouragement to proceed further.'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).)

In this case, the issues raised in the petition do not merit further review. Thus, the Court will deny a COA. The petitioner may, however, seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate order is filed herewith.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE